In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3779

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KELTON SNYDER,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 15-CR-20045 — **Colin S. Bruce**, *Judge.*

ARGUED MAY 25, 2017 — DECIDED JULY 25, 2017

Before WOOD, *Chief Judge*, and BAUER and HAMILTON,
*Circuit Judges*.

HAMILTON, *Circuit Judge*. Paige Mars was murdered late in
the evening of Sunday, April 5, 2015, in the sanitation district
of Decatur, Illinois. Her body was found the next day near the
wastewater lagoons. She had been shot five times with a shot-
gun at point-blank range. She was nineteen years old. Earlier
that weekend, Mars had driven the getaway car for two men

who robbed a convenience store. One of those men was defendant Kelton Snyder. Shortly after the robbery, Snyder and his accomplice became nervous that Mars would disclose their crime to the police, so they decided to murder her. After conspiring together, Snyder's partner lured Mars out to the sanitation district and executed her. Snyder was not present at the time.

The Decatur Police investigated at first, though federal officials later took over and charged Snyder with a series of federal crimes for the convenience store robbery and for conspiring to murder a federal witness in violation of 18 U.S.C. § 1512. Snyder pled guilty to three charges involving the robbery itself: Hobbs Act robbery, 18 U.S.C. § 1951(a); brandishing a firearm during a crime of violence, § 924(c); and being a felon in possession of a firearm, § 922(g). He went to trial on the § 1512 count for conspiring to murder a federal witness. The jury found him guilty. The district court sentenced Snyder to two consecutive life terms plus ten- and twenty-year terms concurrent to the § 1512 life sentence.

Section 1512 defies easy summary. It covers forms of witness tampering ranging from corrupt persuasion up to murder. As applied to Snyder, the statute required the government to prove that if Paige Mars had not been murdered, she was reasonably likely to have communicated with a *federal* law enforcement officer about the robbery. On appeal, Snyder argues that the government's evidence was insufficient to prove that federal nexus element under the standard adopted in *Fowler v. United States*, 563 U.S. 668 (2011). Snyder also challenges the district court's sentencing guideline calculations, and he disputes the substantive reasonableness of his life sentence on the § 924(c) charge. We agree that the government

failed to offer sufficient evidence to satisfy *Fowler*, so we vacate Snyder's § 1512 conviction and its associated mandatory life sentence. We otherwise affirm Snyder's sentence, including the life sentence on the § 924(c) charge.

I.  *Factual and Procedural Background*

In an appellate challenge to the sufficiency of the evidence supporting a criminal conviction, we view all evidence in the light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Resnick*, 823 F.3d 888, 893 (7th Cir. 2016).

A.  *The Convenience Store Robbery and the Murder of Paige Mars*

On Friday, April 3, 2015, Snyder and accomplice Matthew Higgins-Vogt robbed a Circle K convenience store in Decatur, Illinois. The men wore masks and carried shotguns that Snyder had helped acquire. During the robbery, they tied up an employee and a customer, and Snyder held the employee at gunpoint. They stole around $700 and some liquor. Nineteen-year-old Paige Mars, who had no prior criminal record, drove the getaway car.

Hours after the robbery Snyder and Mars began texting and expressing romantic interest in each other. The interest soured by the next day, however, when Mars heard that Snyder was unstable and had beaten his past girlfriends. Snyder attempted to reassure her by saying that he only "beat dumb bitches, not women." Snyder pressed Mars to tell him who had told her this information. He became angry when she would not tell him.

The next day, Sunday, April 5, 2015, Snyder became nervous that Mars might talk with the police about the Circle K

robbery. He voiced these concerns to his ex-girlfriend and one of his friends, saying that he might have to "smoke her." That day Snyder called Higgins-Vogt. A witness overheard Snyder say that he "needed to talk to [Higgins-Vogt] about Paige." Snyder and Higgins-Vogt texted that evening, and at 8:24 p.m. Snyder said he was coming over to Higgins-Vogt's home.

Soon after Snyder's visit, Higgins-Vogt called Mars. He called her at 9:46 p.m. and again at 10:31 p.m., and minutes later Mars texted back "here." At approximately 11:00 p.m., a deputy sheriff near the Decatur sanitation district heard gunshots. Shortly after that, Higgins-Vogt and Snyder communicated via Facebook and telephone. The following morning, April 6, a mechanic at the water treatment plant was on his inspection rounds and found Paige Mars' body. She had been shot five times with a shotgun fired at near contact or very close range.

Later that day Snyder told a friend that the "loose end" from the Circle K robbery had been "taken care of." That person notified the police, and Snyder was promptly arrested. When the police told Snyder he was under arrest for robbery, he responded, "Just robbery?"

B. *Prosecution, Conviction, and Sentence*

Snyder and Higgins-Vogt were initially charged in state court with armed robbery. Those charges were dismissed, however, after federal officials decided to pursue federal charges. On September 3, 2015, a federal grand jury returned a superseding indictment charging Snyder with five federal crimes: Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) (Count 1); brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) (Count 2); possessing a firearm

as a felon in violation of 18 U.S.C. § 922(g) (Count 3); conspiring to kill a witness in violation of 18 U.S.C. §§ 1512(a)(1) and (k) (Count 4); and murder in violation of 18 U.S.C. §§ 924(j)(1), 924(c), 1111, and 2 (aiding and abetting), and *Pinkerton v. United States*, 328 U.S. 640 (1946) (Count 5). The government later agreed to dismiss Count 5. Snyder pled guilty to Counts 1, 2, and 3, but he proceeded to trial on Count 4, conspiracy to murder a federal witness.

One central issue at trial was the federal nexus needed to convict Snyder for conspiring to murder a witness. In *Fowler v. United States*, 563 U.S. 668, 677 (2011), the Supreme Court held that § 1512 requires the government to show that, if the witness tampering had not occurred, there was a "reasonable likelihood" that the witness would have communicated with *federal officers* about the underlying federal offense. In this case, that means the government needed to show a "reasonable likelihood" that Paige Mars would have communicated with a federal officer—not only state or local officers—if she had not been murdered.

After the close of the government's case, the district court denied Snyder's Rule 29 motion for judgment of acquittal, and the court denied his renewed motion at the close of evidence. The court said that it was "ridiculous" to believe the Circle K robbery would have been prosecuted in federal court if Mars had not been murdered, but that there was still a reasonable likelihood that Mars would have communicated with a federal officer because Decatur Police share office space with the FBI and the officers regularly collaborate on cases. In other words, the court found evidence of a reasonable likelihood that Mars would have communicated with an FBI employee who would have assisted with the state investigation and

prosecution of the Circle K robbery. The court submitted the case to the jury, which found Snyder guilty as charged.

Snyder's § 1512 conviction carried a mandatory life sentence. The discussion at sentencing focused on the sentences for Snyder's other three convictions stemming directly from the robbery. Those sentences were certainly worth disputing because of the federal nexus issue hanging over the § 1512 conviction. The revised presentence investigation report, which the district court adopted in full, provided a total offense level of 43 based on the murder cross-reference. Snyder's criminal history category was IV, though the guideline range at offense level 43 is life in prison for any criminal history category. The guideline calculations merged with the statutory maximums to produce an unusually complex path toward a guideline "range" of life in prison at an offense level of 43.

To summarize, the Hobbs Act robbery charge started at offense level 20 under § 2B3.1, plus six levels because Snyder held a shotgun to the back of a victim, beyond merely brandishing a firearm, plus two levels for physically restraining victims, for an adjusted offense level of 28. The guideline range for Count 2, brandishing a firearm during a crime of violence, is 84 months, the statutory mandatory minimum, pursuant to § 2K2.4. For Count 3, felon in possession, the court found that the possession was connected sufficiently to the murder of Paige Mars that it used the homicide cross-reference for premeditated murder pursuant to § 2K2.1(c)(1)(B) and § 2A1.1. That meant the offense level was 43, and two levels were added on the ground that Snyder was an organizer or leader, for an adjusted offense level of 45. On Count 4, conspiring to murder a federal witness, the base

offense level was 43, see § 2A1.1, and two levels were added for being an organizer or leader.

The guideline provisions for multiple counts meant that two more levels were added to the highest offense level for a single count, for a combined adjusted offense level of 47. The court denied a reduction for acceptance of responsibility, but the Guidelines go up to offense level 43, no higher. Accordingly, the court determined that the guideline "range" for Snyder was life in prison.

Snyder challenged various parts of the guideline calculation. He objected to the murder cross-reference for the felon-in-possession count; to the aggravating-role enhancement to the felon-in-possession and witness-tampering counts; and to the denial of a reduction for acceptance of responsibility. The court overruled all of Snyder's objections.

The government sought the statutory maximum sentence for each count, and in particular, a consecutive life sentence for brandishing a firearm during a crime of violence under § 924(c). Based on the sentencing factors codified at 18 U.S.C. § 3553(a), the government argued that Snyder was particularly dangerous and should be imprisoned for life even if his § 1512 witness-tampering conviction were to be overturned on appeal. Snyder, in turn, sought a combined total of 324 months on the remaining three counts. He argued that Higgins-Vogt was to blame for the murder, and he emphasized his difficult upbringing.

The district court sentenced Snyder to the statutory maximum for each count: 240 months for the Hobbs Act robbery; 120 months for being a felon in possession; and a life sentence

for conspiring to kill a witness. These three sentences run con-
currently. The court sentenced Snyder to an additional con-
secutive life sentence under § 924(c) for brandishing a firearm
during a crime of violence. The court also provided a term of
supervised release if Snyder were somehow released.

During sentencing the district court emphasized Snyder's
dangerousness, noting that he was "the instigator of the deci-
sion to kill Paige Mars." The court discussed a number of ad-
ditional violent acts committed by Snyder and said that if he
were released, "there is a high probability that the defendant
would be involved in extremely violent action again, proba-
bly resulting in somebody [else] being killed." The court em-
phasized that its decision was informed primarily by the
§ 3553(a) sentencing factors, and that even if the guideline cal-
culation contained errors, it would have given Snyder the
same sentence.

II.  *Analysis*

A.  *Federal Witness Tampering Under 18 U.S.C. § 1512*

On appeal Snyder argues there is insufficient evidence to
show a "reasonable likelihood" that Mars would have com-
municated with a federal officer if she had not been mur-
dered. We review the sufficiency of the evidence by asking
whether, "viewing the evidence in the light most favorable to
the prosecution, any rational trier of fact could have found the
essential elements of the crime beyond a reasonable
doubt." *Resnick*, 823 F.3d at 893, citing *Jackson*, 443 U.S. at 319
(emphasis omitted).

The federal witness-tampering statute imposes a manda-
tory life sentence on "Whoever kills … another person, with
intent to … prevent the communication by any person to a

law enforcement officer or judge *of the United States* of information relating to the commission or possible commission of a Federal offense." 18 U.S.C. § 1512(a)(1)(C) (emphasis added). The same sentence applies to a conspirator. § 1512(k). By specifying officer "of the United States," § 1512 requires showing a reasonable likelihood that the victim would have communicated with a *federal officer*, not a state or local officer. The statute does not require proof that the defendant knew the federal status of the officer or the underlying proceeding. See § 1512(g).

In *Fowler v. United States*, the Supreme Court addressed how § 1512 applies to a defendant who kills a victim to prevent her from speaking to law enforcement generally but not to federal officers in particular. 563 U.S. 668, 672 (2011). In such cases, the Supreme Court instructed courts to consider the counterfactual world in which the victim is not murdered and to ask with whom she would have communicated. To establish the required federal nexus, the "Government must show *a reasonable likelihood* that, had, e.g., the victim communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer." *Id.* at 677. The government need not prove the federal nexus beyond a reasonable doubt, nor even by a preponderance of the evidence. *Id.* at 678. Rather the government must show that the likelihood of the victim communicating with a federal officer was "more than remote, outlandish, or simply hypothetical." *Id.*

Although this evidentiary standard is low, it is not toothless. In adopting the reasonable likelihood standard, *Fowler* specifically rejected an even lower "possibility standard" under which it would be enough if it was *possible* that the victim

would have communicated with a federal officer. *Id.* at 676–
77. The Court said this approach runs contrary to the lan-
guage and federal scope of the statute: "because of the fre-
quent overlap between state and federal crimes, the use of a
standard based on the word 'possible' would transform a fed-
erally oriented statute into a statute that would deal with
crimes, investigations, and witness tampering that, as a prac-
tical matter, are purely state in nature." *Id.* at 677. Moreover,
the Court noted that because of the extensive overlap between
state and federal crimes, the commission of a federal crime,
without more, generally does not satisfy the reasonable like-
lihood standard. See *id.* at 676.

On appeal, Snyder argues that there is virtually no evi-
dence that Mars would have communicated with a federal of-
ficer about the Circle K robbery. In the immediate aftermath
of the Circle K robbery, only state and local officials investi-
gated the crime. This is unsurprising, Snyder argues, because
statistical evidence shows that robberies of this kind are rarely
prosecuted in federal court. The government responds in sev-
eral ways. Before assessing its response, we outline two sepa-
rate paths the government can take to show the required fed-
eral nexus under § 1512: one path if the underlying crime
would have been prosecuted in federal court, and a second if
it would have been prosecuted in state court.

First, if the underlying crime (here, the Circle K robbery)
would have been prosecuted in federal court, then it is rea-
sonably likely that the witness would have spoken with a fed-
eral officer during the course of that prosecution. For instance,
in 2015 the U.S. Attorney's Office for the Southern District of
Indiana decided to prosecute in federal court all pharmacy

robberies, which had spiked in the wake of the opioid addiction crisis. See Chris Davis, *U.S. Attorney: There Have Been Fewer Pharmacy Robberies in Indiana*, WIBC (May 25, 2017), http://www.wibc.com/news/local-news/us-attorney-there-have-been-fewer-pharmacy-robberies-indiana. If a defendant murdered a witness under those circumstances, *Fowler* would likely be satisfied. The underlying crime (the pharmacy robbery) would have been prosecuted in federal court, and it is reasonably likely that the witness would have communicated with a federal officer during the course of that federal prosecution.

Second, even if the underlying crime would not have been prosecuted in federal court, the government can still satisfy § 1512 by showing a reasonable likelihood that the victim would have communicated with a federal officer who was assisting the state prosecution of the underlying crime. The district court relied on this approach when it denied Snyder's Rule 29 motions. On appeal, the government argues along both paths.

The government first maintains that the Circle K robbery would have been prosecuted in federal court because it involved three federal crimes. The government notes the "federal nature" of Snyder's crimes, and it identifies at least six other convenience store robberies that have been prosecuted in federal court in the Central District of Illinois since Snyder's robbery. The government also notes the "regularity with which both felon-in-possession and § 924(c) charges are brought in federal court."

This evidence falls short. Section 1512 is not satisfied simply because Snyder's underlying crimes amounted to federal offenses. *Fowler* expressly rejected that argument, which

would have reached too far. See 563 U.S. at 676–77. Since there is extensive overlap between state and federal crimes, the fact that the Circle K robbery could be prosecuted under the Hobbs Act, without more, does not satisfy § 1512. We also agree with the district court that it is quite unlikely that this robbery and the associated firearm charges would have been prosecuted in federal court if there had been no murder. The six Hobbs Act robbery cases the government cites do not persuade us otherwise. The record contains data from the FBI's "Uniform Crime Reports," which show that hundreds of commercial robberies occurred in the Central District of Illinois during the same timeframe. If only six were prosecuted under the Hobbs Act, this number does not help but hurts the government's position.

The government also pursues the second path to satisfy § 1512, asserting that even if Snyder's robbery would have been prosecuted in state court, it is reasonably likely that Mars would have communicated with one of the federal officers assisting the Decatur Police. The Decatur deputy police chief testified that it "would be a very real possibility" that the Decatur Police would discuss an armed robbery with federal authorities. The Decatur Police Department has a dedicated space for the FBI, which is occupied by one full-time FBI agent and a Decatur Police detective who is also an FBI task force officer. In Snyder's case, the government notes, the FBI supported Decatur Police by unlocking a cellphone. In addition, Decatur Police asked the FBI to help clarify the image of one of the masked gunmen's tattoos, which was captured by the Circle K security camera.

This evidence is also insufficient. The cellphone that the FBI helped unlock was actually *Paige Mars'* cellphone. If Mars

had not been murdered and had instead cooperated with law enforcement as a witness, there would have been no need to unlock her phone. More fundamentally, evidence that a federal officer assisted with cellphone forensics does not satisfy § 1512 as applied to the murder of an eyewitness. The statute requires a reasonable likelihood that the victim herself would have communicated with a federal officer. Technical support is not communication with a witness. Federal officers can assist state prosecutions in many ways, such as by providing information from the FBI's DNA database, fingerprint analysis, cellphone forensics, etc. But evidence of such technical assistance does not show a reasonable likelihood that the eyewitness in question would have communicated with a federal officer.

The same analysis applies to the Decatur Police's request for FBI assistance to identify the tattoo captured by the Circle K security camera. This form of technical assistance would not likely have involved a federal officer communicating with a witness like Mars. That proved to be the case here. The FBI did nothing in response to the request by Decatur Police because another witness named Burwell came forward and identified Snyder. If the FBI would have supported the state prosecution by communicating with witnesses, it presumably would have communicated with Burwell. That did not happen. Whether proceeding on the first or second path, the government failed to offer evidence sufficient to show a reasonable likelihood that if Mars had not been murdered, she would have communicated with a federal law enforcement officer about the Circle K robbery.

Our holding fits comfortably along the spectrum of decisions by other circuits applying *Fowler*'s "reasonable likelihood" standard to various forms of witness tampering under § 1512, from corrupt persuasion up to murder. The decisions upholding § 1512 convictions involved much stronger showings of a federal nexus than present here. See, e.g., *United States v. Veliz*, 800 F.3d 63, 73–75 (2d Cir. 2015) (defendant's "offenses were not 'purely state in nature'—he committed multiple related crimes across multiple states, with multiple accomplices," and at time of the witness tampering, defendant was already under federal investigation); *United States v. Smith*, 723 F.3d 510, 518 (4th Cir. 2013) (underlying crime involved "large scale gang activity and drug trafficking"); *United States v. Ramos-Cruz*, 667 F.3d 487, 497–98 (4th Cir. 2012) (federal task force was investigating defendant's large gang, and gang informants had already spoken with federal officers).[1]

---

[1] See also *United States v. Tarantino*, 617 F. App'x 62, 64 (2d Cir. 2015) (after federal officers secured grand jury indictment and arrest warrant, "local newspapers had reported widely on the federal investigation," and defendant murdered victim to prevent him from communicating with federal officers); *Stuckey v. United States*, 603 F. App'x 461, 461–62 (6th Cir. 2015) (FBI investigation into defendant's drug organization was underway, and FBI was actively pursuing cooperation from witness before murder); *Aguero v. United States*, 580 F. App'x 748, 749, 753 (11th Cir. 2014) (per curiam) (defendant was involved in "several police-related shootings," and federal officers worked closely with Miami police on such cases); *United States v. Smalls*, 752 F.3d 1227, 1250 (10th Cir. 2014) (witness already cooperating with FBI when killed by defendant); *United States v. Johnson*, 554 F. App'x 586, 587 (9th Cir. 2014) (underlying assault by defendant, "a non-Indian, on the victim, an Indian, is subject to exclusive federal jurisdiction").

The federal nexus in this case is weak even when compared to other § 1512 decisions in favor of defendants. See, e.g., *United States v. Chafin*, 808 F.3d 1263, 1273–75 (11th Cir. 2015) (reversing § 1512 conviction for insufficient evidence of federal nexus where sheriff embezzled more than $10,000 in federal funds); *United States v. Tyler*, 732 F.3d 241, 252 (3d Cir. 2013) (reversing denial of post-conviction petition by defendant who helped murder informant who was cooperating with state task force that regularly referred cases to federal DEA). In *Fowler* itself, the defendant murdered a police officer who learned Fowler was preparing to rob a bank. See 563 U.S. at 670. Murdering a police officer in connection with a bank robbery is much more likely to be prosecuted in federal court than the Circle K robbery at issue here.[2]

Taken together, the evidence does not support a reasonable likelihood that Mars would have communicated with a federal officer if she had not been murdered. Without the murder, it is unlikely the Circle K robbery would have been prosecuted in federal court. And although federal officers may have assisted with a state prosecution, there is insufficient evidence to find a reasonable likelihood that any federal officer would have assisted in a capacity where he would have communicated with eyewitnesses.

---

[2] On remand the district court found that the standard announced in *Fowler* was not satisfied for a § 1512 conviction. See *United States v. Fowler*, 749 F.3d 1010, 1014, 1024 (11th Cir. 2014) (affirming new life sentence on § 924(c) conviction after § 1512 conviction was reversed).

B.  *Sentencing*

We review *de novo* the district court's application of the
Sentencing Guidelines, and we review for clear error its fac-
tual findings. *United States v. Lewis*, 842 F.3d 467, 476 (7th Cir.
2016). We review for abuse of discretion the substantive rea-
sonableness of Snyder's sentence. *Id.* at 477; *United States v.
Conley*, 777 F.3d 910, 914 (7th Cir. 2015).

1.  *Procedural Challenges*

Snyder challenges several steps of the guideline
calculations. He disputes the application of the murder cross-
reference under U.S.S.G. § 2K2.1(c)(1) to the felon-in-
possession count; the application of a two-level aggravating-
role enhancement under § 3B1.1(c) to the felon-in-possession
count; the denial of a two-level reduction under § 3E1.1(a) for
acceptance of responsibility; and the application of a six-level
firearm enhancement under § 2B3.1(b)(2)(B) to the robbery
count. This last objection regarding the six-level firearm
enhancement is raised for the first time on appeal. According
to Snyder, the correct guideline range for his convictions
should have been a combined 57 to 71 months in prison on
Counts 1 and 3 (robbery and felon in possession) and a
consecutive sentence of 84 months on Count 2 (brandishing a
firearm during a crime of violence).

We conclude, however, that we need not address these
specific guideline challenges because even if there had been a
guideline error, it would have been harmless. The district
court expressly based its decision on the § 3553(a) sentencing
factors, not the specific guideline calculation. Since the Su-
preme Court in *United States v. Booker* held that the federal
Sentencing Guidelines are advisory, sentencing judges have

had broad discretion to impose non-guideline sentences. 543 U.S. 220 (2005). In *United States v. Lopez* we explained:

> In a case … presenting a rather technical and arcane question in applying the Sentencing Guidelines, it is perhaps worth another reminder that the Guidelines are, after all, guidelines. They must be considered seriously and applied carefully. In the end, however, the defendant's sentence is the responsibility of the district judge, after careful consideration of all the relevant factors under 18 U.S.C. § 3553(a). … A district court facing a tricky but technical issue under the Guidelines may exercise its discretion under section 3553(a) and may spell out on the record whether and to what extent the resolution of the guideline issue affected the court's final decision on the sentence.

634 F.3d 948, 953–54 (7th Cir. 2011) (citations omitted); see also *United States v. Bloom*, 846 F.3d 243, 257 (7th Cir. 2017); *United States v. Harris*, 718 F.3d 698, 703 n.2 (7th Cir. 2013) ("Sentencing Guidelines are advisory, not mandatory, and … district judges are free to deal with such abstract and artificial [guideline] issues by telling the parties and reviewing courts that the decision on the final sentence did not depend on their resolution"); *United States v. Sanner*, 565 F.3d 400, 406 (7th Cir. 2009) ("When a judge proceeds in this manner, she must make clear that the § 3553(a) factors drive the sentence without regard as to how the prior conviction fits under a particular guideline. Doing so will make the often nit-picking review of issues like

this under our now advisory guideline scheme unnecessary."); *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009); *United States v. Anderson*, 517 F.3d 953, 965 (7th Cir. 2008).

Here, the court stated clearly that the § 3553(a) sentencing factors governed its sentencing decision, notwithstanding the room for argument about how to calculate the advisory guideline range. The court noted that it had "fully considered the advisory guideline range," but that it would "impose the same sentence … even if the Guidelines were calculated differently." This was because the court's "primary focus has been the § 3553(a) factors," so even if the guideline range had been different, the court "would have arrived at the same sentence." The court appropriately exercised its discretion under § 3553(a).

Snyder argues that the difference between the correct guideline range, in his view, and the life sentence he received is so great that we cannot be confident the district court would have imposed the life sentence without the purported calculation errors. We have considered the argument carefully, and we disagree.

Merely invoking § 3553(a) is not necessarily enough to establish that any guideline errors were harmless, particularly when the difference between the correct guideline range and the actual sentence imposed is as great as it might be in this case. See *Gall v. United States*, 552 U.S. 38, 50 (2007) ("[A] major departure [from the Guidelines] should be supported by a more significant justification than a minor one.").

In this case, however, we are confident that the district court intended to impose a life sentence regardless of the § 1512 issue and the guideline disputes on the other counts.

Snyder's arguments for a much lower guideline sentence are built on the assumption that his role in the shocking murder of Paige Mars should not factor into the guideline calculations. We believe that assumption is profoundly mistaken.

A jury found Snyder guilty of conspiring with his accomplice to murder Mars two nights after she drove the getaway car for their robbery. The district judge was certainly entitled, and may well have been obligated, to take that murder into account in sentencing Snyder on the other counts. In imposing a sentence on those counts, the judge was conscious of the possibility that we might rule, as we do, to reverse the § 1512 conviction for insufficient evidence of a federal nexus. The lack of a federal nexus on that charge, however, takes nothing away from the horror and brutality of the murder. Nor does it diminish Snyder's active involvement in plotting that crime, or the connection between the murder and the federal offenses to which he pled guilty. In these circumstances, the district judge's oral and written statements to the effect that his sentence would have been the same regardless of the guideline calculations reflect careful consideration of the sentencing choices and factors. Any arguable guideline errors in the calculation of the sentences on Counts 1, 2, and 3 were harmless.

2. *Substantive Reasonableness*

Snyder also argues that the district court's imposition of a consecutive life sentence for brandishing a firearm during a crime of violence under § 924(c) was substantively unreasonable. In short, Snyder offers an array of statistics to illustrate that the vast majority of defendants convicted under § 924(c) receive significantly lower sentences. Based on these statistics,

he argues that his sentence creates an unwarranted sentencing disparity between himself and other similarly situated defendants. He also claims that the lengthy sentence serves no valid penological purpose because he could "age out" of his violent ways.

By statute, Snyder's brandishing conviction requires a minimum sentence of seven years added consecutively to any other sentence, but the statute provides no specific maximum sentence and thus authorizes a consecutive life sentence. See § 924(c)(1)(A)(ii). The guideline recommendation for § 924(c) is the same as the statutory minimum: 84 months. U.S.S.G. § 2K2.4(b). That is the guideline range in all § 924(c) cases (other than those in which a § 924(c) conviction results in a career offender designation), regardless of the actual circumstances of the offense. There is no presumption that a sentence outside the guideline range is unreasonable, though "a major departure should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50; see also *United States v. Ferguson*, 831 F.3d 850 (7th Cir. 2016) (vacating sentence where district court used § 924(c) to impose sentence thirty-one years above guideline sentence on juvenile carjacking defendant without providing sufficient explanation).

The life sentence for Snyder's § 924(c) conviction is a significant upward variance from the guideline recommendation. It is also a statistical outlier among § 924(c) sentences. However, these statistics alone do not show that Snyder's life sentence was "unwarranted," as he claims. We will uphold an above-guideline sentence provided that the court offered a sufficient statement of its reasons, consistent with § 3553(a), for imposing the sentence. *United States v. Aldridge*, 642 F.3d

537, 544 (7th Cir. 2011). Here, the sentencing judge relied primarily on the § 3553(a) factors, emphasizing the need to protect the public from further violent crimes by Snyder.

The judge considered the § 3553(a) factors at length during Snyder's sentencing hearing. He discussed the nature and circumstances of Snyder's crimes, as well as Snyder's history and characteristics. See § 3553(a)(1). The judge also considered Snyder's ability to rehabilitate but concluded that it was unlikely given Snyder's recurring violent behavior. See § 3553(a)(2)(D). Most important, the judge focused on the "just punishment" for Snyder's offenses and the need to "protect the public" from further crimes. See § 3553(a)(2)(A) and (C).

When considering these factors, the court rightly took into account that a jury found beyond a reasonable doubt that Snyder conspired to murder Paige Mars. See 18 U.S.C. § 3661. Throughout sentencing, and now on appeal, Snyder repeatedly urges the court to consider what his sentence would be if "Mr. Higgins-Vogt's murder of Paige Mars is taken out of the equation." The district court was correct to reject this alternative scenario. The court found that Snyder was "the instigator of the decision to kill Paige Mars," and it was appropriate to consider this during sentencing. It may well have been an abuse of discretion not to do so.

To be clear, in many cases it would be substantively unreasonable to give a life sentence under § 924(c) for brandishing a firearm in the course of a crime of violence. But it is not unreasonable here, where the statutory maximums for the other two counts of conviction (twenty years for the Hobbs Act robbery and ten years for being a felon in possession) would not have allowed the court to take sufficient account of Snyder's

role in the murder of Paige Mars. Congress authorized life sentences under § 924(c)(1)(A)(ii). This is an unusual case where the sentencing judge was justified in using the full statutory range. The court did not abuse its discretion.

The defendant's conviction pursuant to 18 U.S.C. § 1512 is hereby REVERSED, and the life sentence for that offense is VACATED. The defendant's sentences on all other charges are AFFIRMED.