In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 16-3979

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GROVER COLEMAN FERGUSON,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 15-cr-00081 — **William C. Griesbach**, *Chief Judge.*

_____

ARGUED DECEMBER 13, 2017 — DECIDED MAY 2, 2018

_____

Before WOOD, *Chief Judge*, and MANION and HAMILTON, *Circuit Judges*.

MANION, *Circuit Judge*. When Grover Ferguson was 17 years old he shot a woman three times during a carjacking, causing significant permanent injury. Ferguson pleaded guilty to vehicular robbery by force and discharging a gun. The sentencing guidelines range was 198 to 217 months' imprisonment (16.5 to 18 years), but the district judge sentenced Ferguson to 600 months in prison (50 years). He appealed,

and in *United States v. Ferguson*, 831 F.3d 850 (7th Cir. 2016), we vacated his sentence and remanded the case to a new judge, who imposed a 35-year sentence. Now Ferguson argues that the district court failed to adequately consider his youth as a mitigating factor and to properly explain the above-guidelines sentence. We affirm the judgment.

### I. Background

In April 2015, 17-year-old Grover Ferguson stole a handgun from his mother. The next day, while high and drunk, Ferguson checked a gas station for a running car to steal. Not seeing one, he walked for hours. As it became dark, he saw a woman leave her home and approach her car. Ferguson said "hi" to her and the woman later said she did not feel threatened. She went into her house before coming outside again. As she walked to her car, Ferguson hid behind a tree and waited for her to unlock the car door. After the woman got in, Ferguson opened the passenger-side door, pointed a gun at her, and ordered her to give him the keys. The woman paused, initially thinking it was a joke. When he yelled, "Bitch, give me the keys," she feared for her life.

The woman placed the keys on the passenger seat, but still Ferguson shot her several times. Ferguson said that he thought the woman moved toward him, so he fired the gun and then walked to the driver's side and demanded the keys again as she crawled on the street. She was shot three times, including once in the face. The victim's niece and the niece's 4-year-old daughter witnessed the shooting from across the street, where they were gathering belongings from their car. When Ferguson saw the victim's niece, he shouted: "Bitch, get back in the car." Ferguson then started the victim's car and as

she crawled to the curb to avoid being run over, he drove away.

The police were nearby investigating another matter when they heard gunfire and quickly responded to the victim's location. They found her on the ground, bleeding from her face. The victim spent the next four days in the hospital; she survived but suffers permanent injuries, including blindness in one eye. She also suffers from irreparable nerve damage in her ear and face, numbness on the left side of her mouth, and daily pain. One of the bullets is still lodged in her face, and she can no longer drive. (Despite all this, the Social Security Administration denied her application for disability benefits.)

The police caught Ferguson the day after the shooting, but not before he initiated a brief high-speed chase. After his arrest, he admitted taking the car and shooting the victim. Ferguson then pleaded guilty to vehicular robbery by force, 18 U.S.C. § 2119(2), and to discharging a firearm during a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii), pursuant to a nonbinding plea agreement. Sentencing followed. The government recommended that the district court sentence Ferguson to 20 years' imprisonment; the defense recommended 15 years. But the court sentenced Ferguson to 50 years. Ferguson appealed, and we vacated the sentence because the district judge had not explained why a sentence within the guidelines range was so inadequate that a sentence more than 31 years longer than the top end was necessary. *Ferguson*, 831 F.3d at 855.

At resentencing the parties jointly recommended a sentence of 20 years. The government's argument for that above-guidelines sentence focused primarily on the gruesomeness of the crime, the impact on the victim, and Ferguson's juvenile

record. Defense counsel particularly emphasized Ferguson's age, and noted as well his acceptance of responsibility, remorse, and upbringing. Ferguson's post-arrest conduct was also discussed: a probation officer testified that Ferguson had been caught with a weapon in his prison locker but also admitted there was little evidence provided from the prison about that violation. Ferguson also had skipped a prison G.E.D. class five times, but he explained that there were scheduling mishaps when he was called to court and that he had some medical issues. Ferguson did not exercise his right to allocute, but he wrote a letter apologizing to the court and to the victim.

In crafting the sentence, the judge began by analyzing the nature and circumstances of the offense. While acknowledging that the parties understood that Ferguson committed a horrendous crime, the judge explained that the charges and the sentencing guidelines underrepresented the seriousness of the offense. The judge explained that Ferguson was before him for vehicular robbery by force and for discharging a firearm during a crime of violence, but that discharging a firearm "can mean a lot of different things." "When I look at this crime," the judge elaborated, "I see an attempted murder"—"intentional conduct" in which Ferguson "at point blank range shot a woman in the face." He shot her three times, left her to die, and would have driven over her had she not crawled out of the way.

Continuing the analogy to attempted murder, the judge observed that the base-offense level for first-degree murder is 43, which results in an advisory life sentence. "If an attempt, you decrease by three levels, unless the Defendant completed all the acts the Defendant believed necessary for successful

completion of the substantive offense," the judge quoted, and then explained that he believed "the Defendant did everything he could, he reasonably would have believed necessary to take the life of this person." The judge went on to say that Ferguson was "not here for a life sentence" and that "apparently on the Constitution now I can't impose a life sentence even if I thought it appropriate, because he was two months shy of his 18th birthday at the time he committed this offense." But comparing the advisory sentence for attempted murder informed the judge's view of the magnitude of the offense.

The judge next considered the impact of the crime on the victim. Here, Ferguson's actions will have a "lifelong impact" not only "physically disabling, but emotionally and psychologically harming her" as well as "harming those around her." "It's a miracle of modern medicine and a lot of good luck that this woman has the ability to be here today, and to speak to me and ask me to impose what she would regard as a fair sentence, which is the maximum," said the judge.

The judge then discussed the arguments in mitigation. First, he briefly discussed Ferguson's youth, referencing the arguments and scientific studies presented in Ferguson's presentencing memorandum. The judge acknowledged that at 17, Ferguson's brain was not fully developed, and that some doctors say it would not finish developing until his mid-twenties. But he explained: "I don't think, though, we do not hold people responsible for serious crimes until their mid-twenties. We hold them responsible. We certainly consider the youth at the time, and we consider other factors."

The district judge returned to Ferguson's age later in the resentencing hearing. He explained that he was familiar with

scientific literature about brain development but that "scientific literature also tells us about people who are sociopaths." "There are people who have no conscience," the judge continued, referencing people with personality disorders, and there are people who "are very dangerous." But, the judge said: "I'm not here to diagnose Mr. Ferguson. I don't have the ability to do that, and I'm not pretending I do." The judge then said that he had reviewed Supreme Court cases about youth; he noted that "any law mandating a life sentence for homicide would be unconstitutional," but no such law was at issue. The judge concluded: "I want to emphasize that the Supreme Court has never said that because of the slowness of the developing mind in some people, on average, that the Court cannot give strong consideration to the risk, the danger to the community, that an individual represents as reflected by his conduct before sentencing, and his conduct for the very crime that he's been sentenced."

The judge dismissed Ferguson's other mitigation arguments; first he recognized that Ferguson was under the influence of drugs and alcohol at the time of the offense, but found it a flimsy excuse since Ferguson had been driving around with his girlfriend without being pulled over by police or getting into an accident. And the judge acknowledged that Ferguson confessed to his crime, but discounted his acceptance of responsibility because he led the police on a high-speed chase and admitted his conduct only after being caught. The judge also noted that at the first sentencing hearing, Ferguson inexplicably winked at the victim after receiving the 50-year sentence, which, he said, demonstrated his lack of remorse.

Next, the judge turned to Ferguson's history and characteristics, focusing on his upbringing and criminal record. The

judge noted that Ferguson was with his "lousy mother," a crack addict, for only a short time. He was then adopted by his aunt and uncle, who by his aunt's admission, "gave him anything he wanted" and "spoiled him." But at age 13, Ferguson arranged an armed robbery with his cousin so that he could get money from his parents for new shoes. As punishment Ferguson was sent to a reform school, but the sentence was stayed and he was put on probation. He repeatedly violated probation and so was sent to a juvenile detention facility. Within two months of being released, he committed this crime, and this told the judge that Ferguson's crime was not an impulsive event.

In preparing to announce the sentence, the judge concluded that Ferguson posed a substantial risk to the public, that the crime "crie[d] out for deterrence," and that the offense conduct was akin to attempted murder—significantly more severe than the crimes of conviction indicated. The judged then imposed consecutive prison sentences of 120 months and 300 months for the carjacking and the firearm offense, respectively, for a total of 35 years. When the judge later asked Ferguson's counsel if there were any arguments that she felt he had not addressed, counsel replied, "No, Your Honor."

## II. Analysis

Ferguson raises two main arguments on appeal: (1) that the district judge disregarded Supreme Court precedent and failed to adequately consider his youth as a mitigating factor, and (2) that the district judge procedurally erred by not articulating sufficiently his reason for imposing a sentence 17 years longer than the high end of the guidelines range. We review claims of procedural error in sentencing de novo, and

challenges to a sentence's overall substantive reasonableness for an abuse of discretion. *United States v. Thompson*, 864 F.3d 837, 841 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 704 (2018).

Ferguson expressly dubs his second argument a procedural one, but it is not clear how he frames the first. He does not refer to a standard of review for that issue, though he identifies the de novo standard applicable to his procedural challenge. And although the government pointed this out in its response brief, Ferguson did not file any reply brief to clarify the point. We interpret his first argument as substantive because it focuses for the most part on the judge's failure to give due consideration to a legal argument rather than a failure to discuss it on the record (a fine line, to be sure). *See United States v. Matthews*, 701 F.3d 1199, 1204–05 (7th Cir. 2012).

This conclusion also resolves the parties' dispute about whether Ferguson waived his first argument when his counsel agreed that the judge had addressed all of Ferguson's arguments. The government is correct that a contention that the district court failed to address a mitigating argument is waived if the defendant answered affirmatively when asked if he was satisfied that the court had addressed his main arguments in mitigation. *United States v. Garcia-Segura*, 717 F.3d 566, 569 (7th Cir. 2013). "An affirmative answer, however, would not waive an argument as to the merits or reasonableness of the court's treatment of the issue." *Id.* Because we characterize as substantive Ferguson's argument that the district court wrongly applied Supreme Court jurisprudence and generally misunderstood how youth mitigates culpability, he did not waive it.

Nevertheless, Ferguson's argument lacks merit because the district court appropriately considered Ferguson's youth and did not disregard pronouncements of the Supreme Court on that topic. The Supreme Court has indeed grappled with the issue of youth in the context of the death penalty and life sentences without parole, and identified three areas of distinction between youths and adults: (1) a lack of maturity and an underdeveloped sense of responsibility; (2) increased susceptibility to negative influences and outside pressures; and (3) more transitory, less fixed, personality traits. *Roper v. Simmons*, 543 U.S. 551, 569 (2005); *see Graham v. Florida*, 560 U.S. 48, 68 (2010) (explaining, citing *Roper*, that because "juveniles have lessened culpability they are less deserving of the most severe punishments"); *see also Miller v. Alabama*, 567 U.S. 460, 471 (2012) (explaining, citing *Roper* and *Graham*, that "children are constitutionally different from adults for purposes of sentencing").

In this case, the sentencing judge did not, as Ferguson insists, impermissibly ignore or misapprehend the Supreme Court's "juveniles are different" jurisprudence or fail to explain how youth factored into his sentencing decision. For instance he explained that "the Supreme Court has never said that because of the slowness of the developing mind in some people, on average, that the Court cannot give strong consideration to the risk, the danger to the community, that an individual represents as reflected by his conduct before sentencing, and his conduct for the very crime that he's been sentenced for." The judge echoed Justice O'Connor when he emphasized the arbitrariness of a distinction between 18 years and 17 years, 10 months. *See Roper*, 543 U.S. at 601–02 (O'Connor, J., dissenting) (age-based line on death penalty protects mature offenders but leaves vulnerable those who are not).

Contrary to Ferguson's argument, the judge did not merely say that youth is not a "free pass." The judge engaged with Ferguson's mitigating argument; he referred to the scientific evidence about young brains and the Supreme Court's boundaries on sentencing juveniles. He could have expressed less disdain for those boundaries, but he was entitled to disagree. *See United States v. Hancock*, 825 F.3d 340, 345 (7th Cir. 2016). He reasonably concluded that the mitigating factor of youth was outweighed by the nature of the offense, the impact on the victim, Ferguson's long and growing criminal history, his misdeeds while in custody, and his evident lack of remorse.

The judge's express weighing of these factors also dooms Ferguson's second argument, that the district judge procedurally erred by not articulating a basis for imposing a prison sentence 17 years longer than the high end of the guidelines range. That discussion satisfied the obligation to consult the § 3553(a) factors and the mandate to give a proportional explanation for a greater departure from the guidelines range. *See Gall v. United States*, 552 U.S. 38, 49–50 (2007).

Moreover, the judge repeatedly emphasized that the guidelines did not adequately capture the seriousness of the offense, which was most comparable to attempted murder. The judge noted that a conviction for discharging a firearm during a crime of violence carries the same minimum sentence whether a defendant was "shooting off a gun in the course of stealing someone's car" or shooting someone in the face, at point-blank range, and nearly running over her as she crawled away from the car. This failed to account for the severity of the crime, the judge said, emphasizing numerous

times that Ferguson had a more culpable intent not present in simply discharging a firearm into the air.

Ferguson says that one problem with the judge's analysis is that "this wasn't a first-degree murder case." But nothing stopped the judge from consulting a different, but relevant, provision of the guidelines in trying to come up with an appropriate sentence; it is not as though he used the first-degree murder guideline in calculating the offense level. The analogy made the judge's reasoning clearer and more concrete.

Because the district court adequately explained why such a long sentence was "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), we affirm the district court's judgment.